# In The

## *Court of Appeals*

## *Ninth District of Texas at Beaumont*

_____

### NO.  09-12-00074-CR
_____

### ANTHONY JASON KELLY, Appellant

### V.

### THE STATE OF TEXAS, Appellee

_____

**On Appeal from the County Court at Law No. 4**
**Montgomery County, Texas**
**Trial Cause No. 11-265675**

_____

### OPINION

In this appeal, among other issues, we are asked to determine whether the trial court committed error by concluding that Anthony Jason Kelly was required to exhibit a turn signal while travelling on Old Hempstead Road and before turning to continue onto Old Hempstead Road in Montgomery County, Texas. Kelly also contends that the trial court should have suppressed evidence that he refused to voluntarily provide blood or breath specimens, and to provide evidence obtained

1

with a search warrant, a blood test. In a separate issue, Kelly argues that certain statements included in the probable cause affidavit used to obtain a search warrant should not be considered in assessing whether the magistrate reasonably concluded that probable cause existed for the warrant to issue. Finally, Kelly contends the State withheld a statement made by the state trooper who stopped him, in violation of *Brady v. Maryland*, 373 U.S. 83 (1963).

We conclude that Kelly was required to signal his turn from Old Hempstead Road onto Old Hempstead Road; that the trial court acted within its discretion by denying his motions to suppress; that the trial court did not improperly consider the statements at issue in the probable cause affidavit in reaching its conclusions regarding the validity of the search; and that the statement of the state trooper the State refused to produce does not contain material exculpatory or impeachment evidence such that it was required to be produced.

Facts

While approaching a stop sign governing northbound traffic on Old Hempstead Road, Trooper Jarad Gray observed a truck that was southbound on Old Hempstead Road take "a right onto Old Hempstead" just before the road the truck was on became Goodson Road. According to Trooper Gray, who was approaching a stop sign at the intersection where the truck driven by Kelly turned,

2

he did not see a blinking signal as the truck "turned through the intersection." After turning around to follow the truck, Trooper Gray noticed the truck's rear license plate was partially obscured. When Trooper Gray stopped the truck, he noticed that the tailgate of the truck was down, and that the tailgate was the object that had obstructed his view of the truck's rear license plate. A videotape admitted during the hearing on Kelly's motion to suppress does not show that Kelly signaled before he turned from Old Hempstead Road to continue on Old Hempstead Road.

Shortly after turning around, Trooper Gray stopped Kelly. Kelly asked why he was being stopped, and he informed Trooper Gray that he was a police officer. Trooper Gray smelled the odor of an alcoholic beverage, and asked Kelly to step out of the truck. Trooper Gray detected six out of six clues on the HGN test that he gave to Kelly. Kelly refused Trooper Gray's request for further field sobriety testing.

Based on his investigation, Trooper Gray concluded that Kelly was intoxicated and arrested him. Kelly refused Trooper Gray's request to provide a breath specimen, even though Trooper Gray read the various statutorily required warnings about the consequences of such a refusal. Although Kelly received a written copy of the warnings in his property at the jail, Trooper Gray did not hand Kelly a written copy of the warnings during the stop. While Kelly was at the jail,

based on Trooper Gray's affidavit, a magistrate issued a search warrant that authorized the police to obtain a sample of Kelly's blood.

Prior to trial, Kelly moved to suppress all testimony and physical evidence obtained from the investigation. According to Kelly's motion to suppress, Trooper Gray did not have probable cause to conduct the stop. In a second motion, Kelly moved to suppress the fact that he refused to voluntarily give Trooper Gray a breath sample, arguing that he would have given a breath specimen "had the proper warnings been administered to him[.]" In a third motion, Kelly moved to suppress any evidence seized under the search warrant, arguing that it had been issued without probable cause. The trial court denied each of Kelly's motions to suppress.

Kelly also filed a *Brady* motion, in which he requested the State to produce the substance of any oral statement of any person containing information favorable to the defendant and to produce any information tending to adversely affect the credibility of any person the State intended to call as a witness. At the hearing on Kelly's *Brady* motion, Kelly asked the trial court to conduct an *in camera* review of a statement that Trooper Gray had given the Texas Rangers in connection with the Rangers' investigation of the manner Trooper Gray handled Kelly's arrest. The State argued that the request was a fishing expedition because Trooper Gray's statement was not exculpatory and because nothing in the statement could be used

for impeachment. The trial court declined to inspect Trooper Gray's statement *in camera* and denied Kelly's request that the statement be produced.

After the trial court denied Kelly's pre-trial motions, to carry out the terms of a plea bargain, Kelly pled guilty to driving while intoxicated, a misdemeanor. The trial court certified Kelly's right to appeal the matters raised by his written motions.

Standard of Review-Motions to Suppress

We first address Kelly's issues that assert the evidence in his case should have been suppressed, issues one, three, four, and five. In reviewing a trial court's rulings on motions to suppress, we afford almost total deference to the trial court's determination of facts, if those facts are supported by the record. *State v. Duran*, 396 S.W.3d 563, 570 (Tex. Crim. App. 2013). Since the State prevailed on the motions at issue in this appeal, we "view the trial judge's factual findings in the light most favorable" to the trial court's conclusion not to suppress the evidence that resulted from the investigation of the stop. *See id*. at 571. The trial court's application of search and seizure law to the facts in a case are reviewed *de novo*, and an appellate court is to affirm the trial court's ruling if the record reasonably supports the ruling and the ruling is correct on any theory of law applicable to the case. *See id*.

Reasonable Suspicion For Stop

Before making a traffic stop, an officer must have reasonable suspicion that some crime was, or is about to be, committed. *Derichsweiler v. State*, 348 S.W.3d 906, 914 (Tex. Crim. App. 2011). When an officer observes a driver commit a traffic offense, reasonable suspicion exists to justify stopping the driver. *See Arizona v. Johnson*, 555 U.S. 323, 331 (2009). Determining whether evidence from a stop was properly admitted generally turns on "'whether the officer's action was justified at its inception, and whether it was reasonably related in scope to the circumstances which justified the interference in the first place.'" *U.S. v. Sharpe*, 470 U.S. 675, 675-76 (1985) (applying *Terry v. Ohio*, 392 U.S. 1 (1968)).

In his first issue, Kelly argues that he was not required to signal because he turned and continued on the same road he was on, Old Hempstead Road. No stop sign required Kelly to stop before turning at the intersection in issue. Kelly also argues that Trooper Gray could not legally stop him for having an obscured license plate when the object blocking the plate on his truck was the tailgate and not an object attached or displayed on the license plate.

In his appeal, Kelly has not challenged the trial court's finding of fact that he failed to signal at the intersection at issue. Instead, he contends he was not legally required to signal because, based on the configuration of the roadway, he did not

make a turn.[1] In this case, the parties do not disagree about the physical characteristics of the roadway; instead, the parties dispute whether the law required a driver to signal given those physical characteristics. Given that the question is whether Kelly was legally obligated to signal and that the configuration of the roadway is not disputed, Kelly's first issue presents a question of law and is reviewed *de novo*. *See Robinson v. State*, 377 S.W.3d 712, 722-23 (Tex. Crim. App. 2012).

Texas law requires that "[a]n operator intending to turn a vehicle right or left shall signal continuously for not less than the last 100 feet of movement of the vehicle before the turn." Tex. Transp. Code Ann. § 545.104(b) (West 2011). "Turn" is not defined by statute, but the Texas Court of Criminal Appeals has defined "turn" "in the context of driving," to mean "to change directions--to turn

---

[1]Although we resolve the issue as a matter of law, we note that at the suppression hearing, Kelly described the movement of his truck as a turn. He testified as follows:

Q. All right. Did you signal your turn?
A. Yes, sir.
Q. Okay. And why did you signal if you never left Old Hempstead?
A. Excuse me?
Q. Why did you signal?
A. Because I was making a right hand oriented turn.

The trial court chose to believe Trooper Gray's testimony that Kelly failed to signal.

7

the vehicle from a direct course of the roadway." *Mahaffey v. State*, 316 S.W.3d 633, 639 (Tex. Crim. App. 2010).

Based on the exhibits depicting the intersection at issue, we estimate that as Kelly was travelling in a southeasterly direction on Old Hempstead Road, he turned approximately fifty-five to seventy degrees to proceed in a southwesterly direction on Old Hempstead Road. A stop sign requires that traffic travelling in a northeasterly direction on Old Hempstead Road stop before turning on the part of Old Hempstead Road on which Kelly was travelling. However, Kelly would not have been required to stop had he continued travelling the same direction on Old Hempstead Road, which then becomes Goodson Road. Thus, by choosing to turn and proceed in a southwesterly direction on Old Hempstead Road, Kelly turned off the direct course of the road that he was on even though the name of the road did not change; he also changed directions.

Kelly cites *Trahan v. State*, 16 S.W.3d 146, 147 (Tex. App.—Beaumont 2000, no pet.), which states that a ninety degree turn is the type of turn the driver is required by statute to signal. *See* Tex. Transp. Code Ann. § 545.104(a) (West 2011). However, *Trahan* concerned a vehicle exiting from an interstate highway, which requires significantly less movement than the turn at issue here; additionally, since the movement in *Trahan* was not a ninety degree turn, our

8

comment that the statute contemplated a ninety degree turn is dicta. Moreover, we agree with our sister court's statement that a turn need not be ninety degrees to require a signal. *See Reha v. State*, 99 S.W.3d 373, 376 (Tex. App.—Corpus Christi 2003, no pet.) (holding that a turn made "between sixty-five and seventy degrees" required a signal).

We conclude that section 545.104(b) of the Texas Transportation Code, providing that "[a]n operator intending to turn a vehicle right or left shall signal continuously for not less than the last 100 feet of movement of the vehicle before the turn," required Kelly to signal his turn. The trial court's finding that Kelly failed to signal is not challenged. Consequently, Trooper Gray witnessed a violation of a traffic law that gave him reasonable suspicion to stop Kelly's truck. *See Derichsweiler*, 348 S.W.3d at 914; *see also Johnson*, 555 U.S. at 331. We overrule Kelly's first issue.[2]

Statutory Warnings Regarding Breath Specimen

In issue three, Kelly complains that Trooper Gray failed to provide him with a written copy of the statutory warnings that address the consequences of refusing to provide a specimen, and that Trooper Gray failed to request that he sign the

---

[2]Because Trooper Gray's observation of a traffic violation justified the stop, we need not address Kelly's argument regarding the allegedly obscured license plate. *See* Tex. R. App. P. 47.1.

9

form to indicate his refusal. *See* Tex. Transp. Code Ann. § 724.015(1), (2) (West Supp. 2012).[3] Kelly contends that had he been given a written copy of the warnings, he would have provided a specimen.

When an officer has arrested a person for operating a motor vehicle while intoxicated, the Texas Transportation Code requires the officer to inform the person, orally and in writing, that refusing "to submit to the taking of the specimen . . . may be admissible in a subsequent prosecution[,]" and that refusing "to submit to the taking of the specimen" will result in the automatic suspension of the person's license, "whether or not the person is subsequently prosecuted as a result of the arrest, for not less than 180 days[.]" Tex. Transp. Code Ann. § 724.015(1), (2). The purpose of requiring officers to provide a person who has been arrested with statutory warnings orally and in writing is "to ensure that a person who refuses to give a requested specimen does so with a full understanding of the consequences." *Nebes v. State*, 743 S.W.2d 729, 730 (Tex. App.—Houston [1st Dist.] 1987, no pet.). However, "evidence is not 'obtained . . . in violation' of a provision of law if there is no causal connection between the illegal conduct and the acquisition of the evidence." *Gonzales v. State*, 67 S.W.3d 910, 912 (Tex.

---

[3]Although the statute requiring the warnings at issue has been amended, the amended statute requires the same warnings as the statute that applied when Kelly was arrested. Therefore, we cite to the current version of the statute.

10

Crim. App. 2002) (citations omitted). To prove a causal connection between Trooper Gray's failure to provide the statutory warnings in writing and Kelly's refusal to provide a specimen, Kelly was required to show that Trooper Gray's omissions in following the requirements of the statute were the reasons that he refused to consent to providing the requested specimen. *See State v. Woehst*, 175 S.W.3d 329, 333 (Tex. App.—Houston [1st Dist.] 2004, no pet.) (applying causal connection test to officer's providing a driver arrested for DWI a factually inaccurate warning).

Kelly does not dispute that Trooper Gray orally read the required warnings to him before he refused Trooper Gray's request for a breath specimen. Kelly also testified that he had been a police officer for twenty-one years, confirmed that he had been certified in standardized field sobriety tests, agreed that he had conducted DWI investigations, and explained that he had been trained on how to properly provide the required warnings. Kelly testified that he heard Trooper Gray when Gray read the statutory warnings to him. In its findings of fact, the trial court found that Kelly "was able to understand the substance of the DIC-24" statutory warning while Trooper Gray "read them out loud." In its conclusions of law, the trial court found that "[a]ny mistake in advising [Kelly] of consequences under [the] DIC-24 was harmless because [Kelly] was already aware of its contents." Although Kelly

11

testified that he would not have refused Trooper Gray's request had he been provided a written copy of the statutory warnings and asked to sign them, the trial court—as the finder of fact—chose not to believe his testimony. *See State v. Ross*, 32 S.W.3d 853, 855 (Tex. Crim. App. 2000).

Trial courts decide the facts, and we are required to view the trial court's factual findings in suppression cases in the light most favorable to the trial court's conclusion. *See Duran*, 396 S.W.3d at 571. When viewed in the light most favorable to the trial court's ruling, the trial court's finding that Kelly understood the substance of the statutory warnings is supported by the record. Based on the evidence before it, the trial court had the discretion to reject Kelly's claim that a causal connection existed between Trooper Gray's omissions and Kelly's refusal of Trooper Gray's request to provide a breath specimen. We overrule Kelly's third issue.

## Probable Cause for Search

In Kelly's fourth issue, Kelly contends that Trooper Gray's affidavit was insufficient to support the magistrate's conclusion that Kelly was probably guilty of driving while intoxicated. Kelly argues that because the search warrant was not validly issued, the trial court should have suppressed the results from his blood test.

According to Kelly, Trooper Gray's affidavit is insufficient because it contains nothing that explains how Trooper Gray was certified in performing field sobriety tests, fails to reflect that Trooper Gray was trained to detect intoxicated drivers, fails to indicate that Trooper Gray's opinions in other cases involving intoxicated person were confirmed by subsequent testing, fails to explain what Kelly had done while driving to lead Trooper Gray to suspect that he might be intoxicated, fails to describe what Kelly said when he refused Trooper Gray's request for a specimen, and fails to indicate which law enforcement agency took Kelly into custody. These arguments focus on information that Kelly contends is not found in Trooper Gray's affidavit rather than attacking the sufficiency of the affidavit on the basis of the information that it does contain.

As a reviewing court, we are required to "give great deference to a magistrate's determination of probable cause." *State v. Jordan*, 342 S.W.3d 565, 569 (Tex. Crim. App. 2011). "Probable cause exists if, under the totality of the circumstances set forth in the affidavit before the magistrate, there is a 'fair probability' that contraband or evidence of a crime will be found in a particular place at the time the warrant is issued." *Id.* at 568-69 (citing *Illinois v. Gates*, 462 U.S. 213, 238 (1983); *Flores v. State*, 319 S.W.3d 697, 702 (Tex. Crim. App. 2010); *Rodriguez v. State*, 232 S.W.3d 55, 60 (Tex. Crim. App. 2007)). In

13

reviewing the magistrate's determination on the issue, we determine whether "the magistrate had a substantial basis for concluding that probable cause existed." *Id*. at 569 (internal quotations omitted).

In construing a probable cause affidavit, the magistrate is permitted to "interpret the affidavit in a non-technical, common-sense manner and may draw reasonable inferences from the facts and circumstances contained within its four corners." *Id*. The Texas Code of Criminal Procedure does not require probable cause affidavits to contain the types of facts that Kelly contends are missing in Trooper Gray's affidavit; instead, the statute is more general, requiring that the probable cause affidavit for a search warrant set "forth substantial facts establishing probable cause[.]" Tex. Code Crim. Proc. Ann. art. 18.01(b) (West Supp. 2012). The affidavit must contain enough information to allow the magistrate "to independently determine probable cause[.]" *Rodriguez*, 232 S.W.3d at 61.

In reviewing the determination of probable cause, we are "not to analyze the affidavit in a hyper-technical manner." *State v. McLain*, 337 S.W.3d 268, 271 (Tex. Crim. App. 2011). Our focus is on "the combined logical force of facts that *are* in the affidavit," and not on whether other facts could or should have been included. *Rodriguez*, 232 S.W.3d at 62. "As long as the magistrate had a

14

substantial basis for concluding that probable cause existed, we will uphold the magistrate's probable cause determination." *Hughes v. State*, 334 S.W.3d 379, 385 (Tex. App.—Amarillo 2011, no pet.) (citing *Gates*, 462 U.S. at 236).

Focusing on the contents of Trooper Gray's affidavit, the affidavit indicates that Trooper Gray is a certified police officer who has completed courses and training in the field of alcohol detection and intoxication-related offenses, and that in the past and, during his employment, he had observed numerous persons who were under the influence of alcohol or other substances. Trooper Gray's affidavit also indicates that he believed that Kelly was operating his truck while intoxicated and that he stopped Kelly for failing to signal.[4] Trooper Gray's affidavit contains his observations that Kelly had a strong odor of alcohol, slurred speech, swayed and appeared unsure in his balance, was talkative and cocky, walked hesitantly and in an unsure manner, and that he turned in an unsure manner. Trooper Gray also indicated that Kelly refused some of the field sobriety tests, and on the test that Trooper Gray did perform—the HGN—Kelly presented six out of six clues. Trooper Gray's affidavit notes that Kelly had a vertical nystagmus, ten bottle caps

---

[4]Trooper Gray's affidavit also mentions that Kelly was stopped for having an obstructed license plate, but because we did not reach Kelly's challenge to whether the obstruction formed a valid basis for the stop, we also do not consider it here.

15

in his front pocket that "were from tonight," and that Kelly told Trooper Gray that he had been drinking at a bon fire.

Viewing the four corners of Trooper Gray's affidavit in a common sense, non-technical manner, we conclude that it provided the magistrate with enough information to allow the magistrate to independently conclude that a fair probability existed that a blood draw would reveal evidence of a crime. *See Jordan*, 342 S.W.3d at 568-69; *Rodriguez*, 232 S.W.3d at 62. We overrule Kelly's fourth issue.

Probable Cause Affidavit and False Statements

In issue five, Kelly argues that if we overrule his fourth issue, we should go outside the four corners of the affidavit and consider testimony from the suppression hearing and consider that during the hearing, Trooper Gray admitted some of his statements in the probable cause affidavit are inaccurate. The allegedly inaccurate statements concern the correct name of the road where the stop occurred; whether the obscured license plate was a valid basis for the stop; and whether Trooper Gray qualified Kelly for nystagmus gaze testing before administering that test. The evidence from the suppression hearing reflects that Trooper Gray's statement in the affidavit about the location of the stop was not

16

accurate and that Trooper Gray qualified Kelly for nystagmus gaze testing after, not before, the testing had occurred.

According to Kelly, under *Franks v. Delaware*, 438 U.S. 154, 155-56 (1978), the trial court should have excised the alleged false statements in Trooper Gray's probable cause affidavit before deciding whether the affidavit sufficiently demonstrated probable cause. Without the benefit of the statements that Kelly contends should be excised, Kelly argues the magistrate did not have sufficient information to determine whether Kelly was driving in a public place. Kelly concludes that after excising the incorrect statement from the affidavit, the magistrate did not have sufficient evidence of probable cause to justify issuing the warrant.

Under *Franks v. Delaware*, if a defendant establishes by a preponderance of the evidence that an affiant made false statements knowingly and intentionally, or with reckless disregard for the truth in a probable cause affidavit, and that the false statements were material to establish probable cause, the false material must be excised from the affidavit. 438 U.S. at 155-56; *Harris v. State*, 227 S.W.3d 83, 85 (Tex. Crim. App. 2007). Although the trial court did not conduct a separate *Franks* hearing, one of the trial court's conclusions was that Trooper Gray "made no deliberate falsehoods in the affidavit for [the] search warrant of [Kelly's] blood."

The trial court also concluded that "[a]ny error in the search warrant was an innocent mistake and if excised the affidavit for search warrant would still have sufficient probable cause[.]" It appears from the trial court's conclusions that the trial court rejected Kelly's claim that Trooper Gray's statements were intentionally false.

"An affidavit supporting a search warrant begins with a presumption of validity; thus, the defendant has the burden of making a preliminary showing of deliberate falsehoods in that affidavit before he is entitled to a *Franks* hearing." *Cates v. State*, 120 S.W.3d 352, 355 (Tex. Crim. App. 2003). While the assumption exists that the evidence supporting a probable cause finding is truthful, the Fourth Amendment does not mandate that every fact in a supporting affidavit be necessarily correct. *See Franks*, 438 U.S at 164-65. "A misstatement in an affidavit that is merely the result of simple negligence or inadvertence, as opposed to reckless disregard for the truth, will not render invalid the warrant based on it." *Dancy v. State*, 728 S.W.2d 772, 782-83 (Tex. Crim. App. 1987) (clarifying that a misstatement in an affidavit resulting from mere negligence in checking or recording facts relevant to probable cause determination "is beyond the pale of *Franks*"); *see also Franks*, 438 U.S. at 165.

18

At the suppression hearing, Trooper Gray admitted that the affidavit incorrectly indicated that Kelly was operating his vehicle on FM 1488 and Old Hockley, when he was actually on Old Hempstead Road. The maps admitted into evidence show that FM 1488 and Old Hockley intersect to the south of the location where Trooper Gray testified the stop occurred. The trial court could have reasonably concluded that Trooper Gray's misstatement about the location of the stop was accidental, not deliberate.

Additionally, Trooper Gray also testified that when he conducted the stop, he did not know what was blocking Kelly's license plate. During the suppression hearing, Trooper Gray testified that having a blocked license plate is not a concern that is typically used for a stop, characterizing having a blocked license plate as a frivolous issue. However, Trooper Gray also explained during the hearing that his observation that Kelly's license plate was blocked, along with the failure to signal, were the reasons that led him to stop Kelly. Based on Trooper Gray's testimony, the trial court could reasonably conclude that Trooper Gray did not deliberately attempt to mislead the magistrate by including in his affidavit all of the reasons motivating him to conduct the stop, whether those reasons ultimately proved to be justified. Based on the evidence, the trial court could reasonably conclude that Trooper Gray did not deliberately attempt to mislead the magistrate by including

19

his observation of the blocked license plate as one of the reasons motivating Kelly's stop.

With respect to the statement in the affidavit that Kelly was "first qualified as a candidate" for nystagmus gaze testing, the trial court was free to accept Trooper Gray's explanation that he asked Kelly the qualifying questions at the jail, and that Kelly's answers did not disqualify him as a viable candidate for nystagmus gaze testing. Consequently, the trial court could reasonably conclude that Trooper Gray qualified Kelly as a candidate, even if the qualifying questions were asked after the testing was performed. In that light, and because the representation regarding the candidate being first qualified is contained in a preprinted form, the trial court could reasonably conclude that Trooper Gray's representation that Kelly was "first qualified" resulted from simple negligence or inadvertence, and that while inaccurate, it was not deliberately false.

The trial court rejected Kelly's assertion that Trooper Gray's misstatements were deliberately false. *See Franks*, 438 U.S. at 155-56. The trial court's findings and conclusions regarding the affidavit are supported by the record. *See Dancy*, 728 S.W.2d at 782-83. We overrule Kelly's fifth issue.

20

Alleged *Brady* Violation

In issue two, Kelly contends the State withheld a statement that Trooper Gray gave the Texas Rangers about the stop and subsequent DWI investigation. During the hearing on Kelly's *Brady* motion, Kelly asked the trial court to conduct an *in camera* review of Trooper Gray's statement. The trial court refused to review the interview *in camera*.

While the matter was on appeal, we requested a copy of the statement that Trooper Gray made to the Texas Rangers. Subsequently, the trial court provided us with a sealed electronic recording of Trooper Gray's interview by the Texas Rangers. We have reviewed the interview to determine whether the trial court committed reversible error by failing to require the State to disclose the interview.

To establish a reversible error under *Brady*, a defendant must show:

1) the State failed to disclose evidence, regardless of the prosecution's good or bad faith;

2) the withheld evidence is favorable to [the defendant]; [and]

3) the evidence is material, that is, there is a reasonable probability that had the evidence been disclosed, the outcome of the trial would have been different.

Under *Brady*, the defendant bears the burden of showing that, in light of all the evidence, it is reasonably probable that the outcome of the trial would have been different had the prosecutor made a timely disclosure.

21

*Hampton v. State*, 86 S.W.3d 603, 612 (Tex. Crim. App. 2002) (footnotes omitted). Additionally, "[f]avorable evidence is any evidence that, if disclosed and used effectively, may make a difference between conviction and acquittal and includes both exculpatory and impeachment evidence." *Harm v. State*, 183 S.W.3d 403, 408 (Tex. Crim. App. 2006). "Exculpatory evidence may justify, excuse, or clear the defendant from fault, while impeachment evidence is that which disputes or contradicts other evidence." *Id.* Under *Brady*, the materiality of undisclosed information is not sufficiently proven by showing a mere possibility that undisclosed information might have helped in the defense or that the undisclosed information might have affected the outcome of the trial. *Hampton*, 86 S.W.3d at 612.

Having reviewed Trooper Gray's interview with the Texas Rangers, we conclude that it does not contain exculpatory or impeachment evidence that was material to Kelly's defense. *See Hampton*, 86 S.W.3d at 612. Accordingly, we overrule Kelly's second issue.

Having overruled all of Kelly's issues, we affirm the trial court's judgment.

AFFIRMED.

_____
HOLLIS HORTON
Justice

Submitted on December 27, 2012
Opinion Delivered September 18, 2013
Publish

Before Gaultney, Kreger, and Horton, JJ.

23